UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSHUA A. GABOR, | |
| Plaintiff, | No. 15 CV 8508 |
| vs. | Hon. Jorge L. Alonso |
| WEXFORD HEALTH SOURCES, and DR. JAGGANATH PATIL, | Magistrate Judge Sunil R. Harjani |
| Defendants. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO THE WEXFORD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Joshua Gabor, by his court-appointed attorneys, Foley & Lardner LLP, and in Opposition to the Wexford Defendants' Motion for Summary Judgment, states as follows:

**INTRODUCTION**

The Court should deny the Wexford Defendants' Motion for Summary Judgment ("Motion"), as there is an inescapable dispute of material facts that precludes the entry of summary judgment. Plaintiff Joshua Gabor was diagnosed with Post-Traumatic Stress Disorder ("PTSD") and general anxiety in 2007, stemming from his years working as a firefighter and paramedic and the sudden death of his fiancée. Plaintiff's LR 56.1(b)(3) Statement of Facts ("SOF"), ¶ 1. Gabor was prescribed Xanax and under the careful care of his treating psychiatrist and with the aid of medication, Gabor was able to manage his anxiety and PTSD. SOF, ¶ 3. On October 3, 2013, however, Gabor came into Wexford's care at the Stateville Correctional Center. SOF, 11. Without Gabor's consent, Wexford's agents – first at Stateville, then at Vandalia Correctional Center beginning on October 23 – unilaterally terminated Gabor's treatment of benzodiazepines, without

1

an appropriate taper. SOF, ¶ 34. Compounding that error, Wexford and its physicians—including Dr. Patil—failed to appropriately monitor Gabor when he experienced severe withdrawal symptoms. SOF, ¶ 27. Gabor repeatedly reported his withdrawal symptoms, but Dr. Patil disregarded Gabor and ignored his warning pleas. SOF, 22. The result was as catastrophic as it was predictable: Gabor experienced seizures, severe pain, and mental anguish that continues to affect him to this day. SOF, ¶ 25.

Wexford's mistreatment of Gabor stems from its practice of applying a "blanket policy and policy—as opposed to individualized treatment—prohibiting the administration of . . . benzodiazepines such as Klonopin and Xanax to prisoners when [as here] they were prescribed by their physician." SOF, ¶ 21. Gabor's allegations of such an improper practice are not only corroborated by his Harvard-trained neuropsychic expert witness, Dr. Bursztajn, but also by Dr. Pablo Stewart, a court-appointed monitor who examined IDOC facilities (including Stateville) during the relevant time period and testified in this case that he personally observed that Wexford's doctors lacked medical records from patients' transferring facilities, did not adequately consult with patients before prescribing medication, did not obtain informed consent from patients when changing prescriptions, did not provide adequate monitoring to patients who received psychiatric medical care, and patients who received Xanax or Klonopin prior to arriving at the IDOC facility would receive different medication without explanation. SOF, ¶ 38. Just like Gabor, Stewart "personally encountered . . . people that were being sent into IDOC who had been well maintained on benzodiazepines at their county jails where they were being held prior to being sent to prison and . . . IDOC would stop them without explanation." SOF, ¶ 39. In fact, Wexford's own witness testified in this case to Wexford's policy for patients like Gabor who come into Wexford's care with a prescription for benzodiazepines: "They will be taken off." SOF, ¶ 23.

The Seventh Circuit and other federal courts have held repeatedly that abrupt changes in medication away from benzodiazepines, unaccompanied by a medically-appropriate taper period, can amount to deliberate indifference in violation of a prisoner's Eighth and Fourteenth Amendment rights. *See, e.g., King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012); *Treadwell v. McHenry County*, 193 F. Supp. 3d 900, 910 (N.D. Ill. 2016). Both the factual record and legal precedent compel this Court to deny Wexford's Motion and to set this case for trial.

## MATERIAL FACTS

Gabor incorporates his Local 56.1 Statement of Material Facts ("SOF") and Plaintiff's Response to Local 56.1 Statement of Undisputed Facts by the Wexford Defendants ("RSOF").

## SUMMARY JUDGMENT STANDARD

Summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In deciding a motion for summary judgment, the court's rule is not to evaluate evidence or determine the truth of the matter, but rather only to determine whether there is a genuine issue of material fact. *Moore v. Ford Motor Co.*, 901 F. Supp. 1293, 1296 (N.D. Ill. 1995).

Evidence presented by a party opposing summary judgment that is supported by affidavits or other evidentiary material is to be taken as true. *Askew v. Bloemker*, 548 F. 2d 673, 679 (7th Cir. 1976). All facts are to be construed in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U. S. 574, 587 (1986). In doing so, the court should not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009).

## ARGUMENT

Gabor maintains Section 1983 claims of deliberate indifference against Wexford and its physician employee, Dr. Patil, as well as a medical malpractice claim against Dr. Patil.[1] The Wexford Defendants argue they are entitled to summary judgment on the following grounds: (1) Gabor does not offer any expert evidence critical of Dr. Patil's treatment; (2) Gabor's injuries were not caused by the Wexford Defendants; and (3) Gabor has failed to offer evidence sufficient to create a genuine issue of material fact as to whether Wexford employed a policy that refuses to administer benzodiazepines to inmates such as Gabor, regardless of the patient's medical needs and risks. The Wexford Defendants are wrong on as to each of these arguments. Indeed, there is substantial factual and expert evidence in the record from which a jury could conclude that Dr. Patil not only violated the standard of care in his treatment of Gabor but in fact acted with deliberate indifference to Gabor's medical needs. Moreover, there is ample evidence that Wexford applied a blanket policy or practice that refused to administer benzodiazepines to Gabor (and other patients) regardless of medical the actual practice of Wexford and its employees with regard to the dispensation of benzodiazepines (or lack thereof) was so inadequate that there was a substantial risk that he would be deprived of necessary care in violation of his constitutional rights. Given this dispute of material facts, the Court should deny the Wexford Defendants' Motion.

I. **THERE IS A GENUINE ISSUE OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT AS TO GABOR'S § 1983 AND NEGLIGENCE CLAIMS AGAINST DR. PATIL.**

Gabor's § 1983 claim against Dr. Patil (Count III) contains two elements: (1) Gabor had an "objectively serious medical need" while under Wexford's care and (2) the Wexford Defendants

---

[1] Gabor does not challenge the dismissal of his personal claims against Dr. Kononov due to Dr. Kononov's death.

4

acted in a manner that was deliberately indifferent to Gabor's medical needs. *King*, 680 F.3d at 1018; *Woodward v. Correctional Med. Svcs.*, 368 F.3d 917, 926 (7th Cir. 2004). The Wexford Defendants do not dispute that Gabor had a serious medical need while under Wexford's care; indeed, they spend the bulk of their Motion detailing the needs that Gabor presented when he was first placed in IDOC custody. *See* Br. at 1-3, 10-11. Thus, to defeat summary judgment, Gabor must merely show that there is a question of material fact as to whether Dr. Patil acted with deliberate indifference to Gabor's care. There is ample record evidence reflecting such indifference, thus precluding an award of summary judgment.

### A. Dr. Patil Acted With Deliberate Indifference To Gabor's Medical Care, Thus Depriving Gabor Of His Constitutional Rights.

#### 1. Dr. Patil Was Subjectively Aware Of Gabor's Serious Medical Need, And Disregarded It In Violation Of Gabor's Constitutional Rights.

The Wexford Defendants argue that Dr. Patil is entitled to summary judgment because, they claim, his level of care did not sink to the level of a constitutional deprivation. *See* Br. at 8-9. A medical professional defendant acts with deliberate indifference when his or hers' "decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *King*, 680 F.3d at 1018-19. The Wexford Defendants assert that Dr. Patil's care did not fall to this standard because "Dr. Patil saw Plaintiff on multiple occasions during his [10-month] stay at Vandalia," Br. at 9, but that does not save Dr. Patil. A plaintiff need not show the defendants "literally ignored" his serious medical condition; he must merely "show only that the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008); *see also Woodward*, 368 F.3d at 926 (deliberate indifference is more than negligence but less than purposeful infliction of harm). Further, subjective awareness and deliberate indifference can be shown by circumstantial

5

evidence, *id,* or by evidence that the defendant's treatment constituted a substantial departure from acceptable medical judgment, practice, or standards. *LaBoy v. Ghosh*, 2011 WL 6140855, *4 (N.D. Ill. December 9, 2011).

There is sufficient evidence from which the jury could find that Dr. Patil acted with deliberate indifference towards Gabor. When Gabor was transferred to the Vandalia Correctional Center, Dr. Patil was informed of Gabor's Xanax prescription and years of use of the medication to treat Gabor's anxiety and PTSD. SOF, 22. Dr. Patil was also advised of the abrupt and accelerated taper from Klonopin that Dr. Kononov had started, and that Gabor reported he had been experiencing Klonopin withdrawal. *Id.* Indeed, Gabor repeatedly informed Dr. Patil during their initial meeting that he was experiencing Klonopin withdrawal. *Id.*

Despite these flashing warning signs, Dr. Patil failed to re-administer Klonopin to address Gabor's anxiety, attacks and seizures caused by the abrupt taper. Permitting this accelerated taper, notwithstanding Gabor's consistent and successful use of Xanax for years, was "simply not in keeping with any of the standards of care" for a treating psychiatrist. SOF, ¶ 33 (Gabor "basically went from milligrams to zero in 19 days and that's way too quick. That's not even close to any – I mean, that's what he d—blatantly disregarding the – the fundamental premise of medical practice, which is primum nocere, first of all, do no harm"). Indeed, rather than address Gabor's withdrawal symptoms by reinstating Gabor on Klonopin, Dr. Patil instead prescribed medication that was known to exacerbate withdrawal symptoms and increase the likelihood of seizures. SOF, ¶ 24.

Dr. Patil's decision to continue the accelerated taper and refusal to re-administer Klonopin to address Gabor's withdrawal symptoms was not based on Dr. Patil's assessment of Gabor's individual needs and risks, but rather on his following Wexford's practice of getting psychiatric patients off of benzodiazepines immediately upon taking custody of them:

6

> Q: Okay. Prior to seeing Mr. Gabor, had you ever encountered patients who were suffering with withdrawal from benzodiazepines?
>
> A: Yes.
>
> Q: Can you approximate how many patients you encountered like that before Mr. Gabor in November 2013?
>
> A: It happens all the time. Being a patient in psychiatric treatment, we have patients on benzodiazepines. **We take them off**. As a part of residency training, we have patients coming off the street to ER, psychiatric ER. **They will be taken off**. So I have seen, yeah.

SOF, ¶ 23.

Further, Dr. Patil did not meet with Gabor again until three months later, on January 9, 2014. SOF, ¶ 27. Dr. Patil explained that he did not meet with Gabor earlier because this eight-week interval between visits was "standard." *Id.* Here, again, Patil's actions departed substantially from medical standards, which required Dr. Patil to tailor the level of monitoring to the specifics of Gabor's needs and which, given the circumstances, required "at least" a "once-a-week" visit with Gabor until his withdrawal symptoms subsided. SOF, ¶ 25

The fact that a prisoner received some treatment does not defeat his claim if the treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005). Indeed, this standard can be met when a medical provider refuses to alter a patient's course of treatment despite repeated reports the medicine was not working and the patient's condition was worsening. *Id*.

The Wexford Defendants cite Gabor's refusal to take Tegretol (which, contra the Wexford Defendants' "cheeking" assertion, Gabor openly disclosed to Dr. Patil) as a basis to avoid liability, *see* Br. at 10, but that ignores that (a) Gabor was not given any explanation about the risks and potential harms that Tegretol could cause, particularly when used with BusPar to treat anxiety, and thus Gabor could not have provided informed consent to use Tegretol; and (b) Gabor's non-use of

7

Tegretol is irrelevant to the Wexford Defendants' failures here – pushing an accelerated taper from benzodiazepines that falls far outside of accepted medical practice, and failing to adequately monitor and treat Gabor during his withdrawal.[2] Plaintiff's Response to Plaintiff's Statement of Facts ("RSOF") ¶ 43. The Wexford Defendants' cases are readily distinguishable and do not support their Motion.[3] *See* Br. at 9.

### 2. Dr. Bursztajn Has Testified That Dr. Patil Blatantly And Inappropriately Deviated From The Standard Of Care.

The Wexford Defendants additionally ask this Court to grant them summary judgment as to Gabor's § 1983 claim against Dr. Patil based on the false premise that Gabor has not offered any expert evidence critical of Dr. Patil. *See* Br. at 7-8. In fact, from the very outset of this case, Gabor has presented evidence by his retained expert witness, Harvard Associate Professor of Psychiatry Dr. Harold Bursztajn, attesting to his opinion that Dr. Patil "deviated from the standard of care in his treatment of Mr. Gabor and that such failures to prov[id]e proper care for Mr. Gabor result[ed] in significant pain, suffering, psychological trauma, and emotional injury inflicted upon

---

[2] Dr. Bursztajn testified, for example, that Tegretol's "usage is quite questionable and disputable" and does not address anxiety and the underlying needs for which benzodiazepines are prescribed. RSOF ¶ 43.

[3] None of the cases upon which the Wexford Defendants rely bear a factual similarity to this case. *Walker v. Peters*, 233 F.3d 494 (7th Cir. 2000), involves a plaintiff challenging the prison's refusal to provide treatment for HIV who refused to take an HIV blood test that would confirm the plaintiff, in fact, had HIV; here, there is no dispute that Gabor in fact suffered from anxiety and PTSD that benzodiazepines are intended to treat. The Seventh Circuit in *Pinkston v. Madry*, 440 F.3d 879 (7th Cir. 2006), meanwhile affirmed summary judgment on the basis that the plaintiff's split lip did not constitute an objectively serious injury triggering the Constitution's protection. And the unpublished Order in *Blankenship v. Birch,* 590 F. App'x 629 (7th Cir. 2014), is wholly inapposite – the *Blankenship* plaintiff suffered pain in his elbow, received surgery, complained about numbness in his elbow and toes following the surgery, was seen multiple times by the treating physician who prescribed light medication and larger shoes, and within months of treatment "no longer complained to anyone about his toes or elbow." *Id.* at 631-32.

4822-6247-8054.4

Mr. Gabor." *See* Second Amended Complaint, Dkt. 67, Ex. B. Dr. Bursztajn rendered each of the following criticisms of Dr. Patil's treatment of Gabor:

- Dr. Patil failed to provide a timely and adequate evaluation of Mr. Gabor after [his] arrival in custody at Vandalia Correctional Center on 10/22/13;

- Failed to provide a prescription for a benzodiazepine for Mr. Gabor;

- Failed to examine, diagnose and treat Mr. Gabor in a timely manner despite Mr. Gabor's requests;

- Failed to adequately treat Mr. Gabor's panic disorder and post-traumatic symptomology throughout his stay at Vandalia Correctional Center from 10/22/13 until his release;

- Failed to do an adequate review of records and collateral sources;

- Failed to take or obtain an adequate clinical history;

- Failed to appropriately consider and address the risk of injury and suffering to Mr. Gabor due to continuing benzodiazepine withdrawal, and;

- Failed to adequately monitor the continuing effects of the discontinuation of benzodiazepines.

SOF, ¶ 32.

Dr. Bursztajn provided further detail of Dr. Patil's failures in his December 13, 2018 expert report. Dr. Bursztajn concluded "that the psychiatric and medical treatment Joshua Gabor received in prison from October 2013 to July 2014"—that is, the period that ***includes*** Gabor's stay at Vandalia under Dr. Patil's care between October 23, 2013 to July 21, 2014—"blatantly and inappropriately deviated from the standard of care . . . with respect to the involuntary, abrupt discontinuation of benzodiazepines, contrary to generally accepted protocols for tapering off such medications and without taking generally accepted precautions for monitoring such withdrawal." SOF, ¶ 31. Dr. Bursztajn criticized Dr. Patil's refusal to prescribe Klonopin, terminating an already-too-rapid taper from the benzodiazepine (SOF, ¶ 35 at ¶ 9), failed to properly monitor Gabor to supervise the effects of Gabor's withdrawal (*id.* at ¶ 10), failed to respond appropriately

9

to Gabor's seizures at Vandalia on October 24, 2013 (*id.* at ¶ 13). Indeed, as Dr. Bursztajn explained at his deposition, Dr. Patil's administration of Celexa and Doxepin – when Dr. Patil knew that Gabor was in withdrawal from a benzodiazepine – could "actually exacerbate the symptom of withdrawal" and "make seizures more likely rather than less likely." SOF, ¶ 33.

Indeed, Dr. Patil's deliberately indifferent treatment of Gabor is at the very heart of Dr. Bursztajn's criticism of the Wexford Defendants' conduct. Dr. Bursztajn opines that the rapid taper from benzodiazepines over the course of a 19-day period fell far outside accepted medical practice. SOF, 33. As Dr. Bursztajn explained, medications such as benzodiazepines "should not be tapered more quickly than 10% every three to five days." *Id.* (quoting Federal Bureau of Prisons Clinical Practice Guidelines). As Gabor was prescribed 4 milligrams of benzodiazepines per day, a proper tapering would have taken approximately 100 days. RSOF, ¶ 41. Dr. Patil could have and should have "reconsider[ed] and revise[d] [Gabor's] medication regimen as well as to initiate more frequent monitoring" once the effect of the accelerated taper on Gabor became clear, but he failed to so. SOF, ¶ 33 (if withdrawal symptoms occur, "the best thing to do is just to go back up and decrease the medication more slowly than had been done previously"). And Dr. Patil further compounded this error by failing to adequately monitor Gabor during his withdrawal. SOF, ¶ 33

Accordingly, there is ample expert evidence in the record upon which a jury could rely to conclude that Dr. Patil's conduct deviated substantially from accepted medical judgment and amounted to deliberate indifference.

### B.    A Genuine Issue Of Material Fact Precludes Summary Judgment On Patil's Negligence Claim Against Patil.

For the same reasons discussed above, the Wexford Defendants' Motion must fail as to Gabor's claim for negligence against Dr. Patil (Count IV). The Wexford Defendants first argue that Gabor offered no expert evidence that Dr. Patil deviated from the standard of care, *see* Br. at

4822-6247-8054.4

11, but that is false. SOF, ¶ 32 (asserting that Wexford physicians blatantly and inappropriately deviated from the standard of care).

The Wexford Defendants next argue there is no evidence that Dr. Patil caused Gabor injury, in light of Gabor's medical history predating his time under IDOC custody. Br. at 10-11. There can be no serious dispute that Gabor suffered injury in connection with his benzodiazeprine withdrawal, which Dr. Patil continued and failed to treat or monitor appropriately. Moreover, the Wexford Defendants again ignore Dr. Bursztajn's testimony that the "blatantly inappropriate deviations from the standard of care on the part of Wexford Health Sources and the physicians resulted in significant ongoing pain, suffering, psychological trauma, and emotional injury for Joshua Gabor. But for these deviations from the standard of care, he would not have suffered those damages." SOF, 32. Ultimately, the extent to which Gabor suffered injury is a question for the jury to decide, and does not provide a competent basis for this Court to grant summary judgment. *Arens Controls Co., L.L.C. v. Enova Sys.*, No. 08-6994, 2012 U.S. Dist. LEXIS 104696, at *10 (N.D. Ill. Apr. 5, 2012).

## II. THERE IS SUBSTANTIAL EVIDENCE SUPPORTING GABOR'S *MONELL* CLAIM THAT WEXFORD HAS A PRACTICE OF REFUSING TO ADMINISTER XANAX THAT RESULTS IN INAPPROPRIATELY ACCELERATED TAPERS.

The Court should deny the Wexford Defendants' Motion as to Gabor's *Monell* claim against Wexford (Count I). There is ample evidence in the record that Wexford and its employees maintained a policy or practice of refusing to prescribe benzodiazepines to patients, regardless of the individual needs and risks presented by the patient, thus resulting in inadequate and harmful medical care to patients in need of benzodiazepines.

As a contractor acting under color of law, Wexford can be held liable under § 1983 for maintaining a policy or practice that "sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Woodward*, 368 F.3d at 927 (quoting *Estate of*

11

*Novack ex rel. v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000)); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The infliction of unnecessary suffering through the failure to provide adequate medical care for inmates, in turn, constitutes a violation of the Eighth and Fourteenth Amendments. *King*, 680 F.3d at 1020.

The Wexford Defendants do not dispute that a "no benzodiazepine" rule, applied without regard to the specific needs and risks of inmates, is a constitutional violation. Nor could they. The Seventh Circuit has held repeatedly that a blanket policy terminating a patient's drug treatment without an adequate alternative violates the Eighth Amendment under *Monell*. *King*, 680 F.3d at 1021; *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005). Likewise, federal courts have held that the failure to install appropriate protocols and procedures to monitor patients suffering from benzodiazepine withdrawal symptoms amount to a deprivation of an inmate's constitutional right to adequate medical treatment. *See, e.g., Stojcevski v. County of Macomb*, No. 15-11019, 2019 U.S. Dist. LEXIS 167691, at *49-51 (E.D. Mich. Sept. 30, 2019) (denying summary judgment motion on *Monell* claim, explaining defendant "failed to train and supervise its medical and mental health staff to respond to inmates who were using benzodiazepines and opiates prior to their incarceration and thus face the risk of experiencing severe and life-threatening withdrawal symptoms in jail"); *Aus v. Salt Lake City*, No. 16-0266, 2019 U.S. Dist. LEXIS 115505, at *22-33 (D. Utah July 10, 2019) (denying summary judgment motion where defendant established no protocol regarding the monitoring or medical treatment of benzodiazepine withdrawal syndrome); *Treadwell*, 193 F. Supp.3d at 909 (denying summary judgment where defendant "denied [plaintiff] his validly prescribed medication without any physician oversight of the decision based solely on its policy of denying certain prescribed medications to newly admitted inmates and, thereby, led to painful withdrawal symptoms").

Thus, the only question presented by the Wexford Defendants' Motion—and the only argument the Wexford Defendants advance—is whether there is any evidence in the record from which the jury could conclude that Wexford maintains a policy or practice of refusing to administer benzodiazepines to patients, regardless of their individual needs, risks and medical histories, and likewise fail to monitor and treat patients suffering from the predictable withdrawal symptoms caused by this failure to administer benzodiazepines. There is not only sufficient evidence of such a policy or practice to support such a finding; in fact, the evidence is overwhelming.

First, Wexford's own witnesses testified to the existence of such a policy. Explaining what happens when patients who are prescribed benzodiazepines are presented to Wexford's custody at IDOC facilities, Dr. Patil testified: "It happens all the time. Being a patient in psychiatric treatment, we have patients on benzodiazepines. *We take them off.*" SOF, ¶ 23. Likewise, Vandalia's Medical Director, Dr. Caldwell, effectively acknowledged that Wexford had a policy at Stateville to discontinue benzodiazepine treatment, regardless of a patient's individual needs and medical risks. SOF, ¶ 21. ("Put it like this. With the time that I've been there, the time we go through, Stateville, when they come through, they have been thoroughly detoxed").

Second, Dr. Pablo Stewart, the court-appointed monitor charged with evaluating IDOC's implementation of corrective measures to address its treatment of inmates with mental illnesses in its facilities throughout Illinois, testified in this case as to his observations when evaluating the psychiatric treatment provided at Stateville and other IDOC facilities. *See* SOF, ¶ 36. Stewart testified as follows:

> Q: What, if anything, do you recall of your observations with regard to the treatment of patients who were either on benzos or who were on benzos when they came in? Anything that you can recall?
>
> A: During the first year of the monitoring process, I personally encountered – as well as my colleagues encountering – examples, usually of people that were being sent into IDOC who had been well maintained on

13

> benzodiazepines at their county jails where they were being held prior to being sent to prison and that the department, meaning IDOC, would stop them without explanation.

SOF, ¶¶ 39, 40 ("At Stateville, because of inadequate access to prior mental health records (discussed below), inmates may receive different medicines than they received before arriving" and often with "no explanation as to why a different medication is prescribed"). Stewart likewise testified that Gabor's allegation in Paragraph 18 of the Second Amended Complaint that the Wexford Defendants ordered an accelerated taper from benzodiazepines that was made without consultation with Gabor's treating psychiatrist and was made on the basis of the Wexford Defendants' "no benzodiazepines rule" was consistent with what Stewart "encountered generally within IDOC during the first year of monitoring." SOF, ¶ 40.

Third, Dr. Bursztajn likewise observed that the Wexford Defendants "treated [Gabor] as if under a blanket practice and policy—as opposed to individualized treatment—prohibiting the administration of controlled substances, including benzodiazepines such as Klonopin and Xanax, to prisoners even when they were prescribed by their physician." SOF, ¶ 35 at ¶ 4.[4]

Ignoring this evidence, the Wexford Defendants instead note that Klonopin is on Wexford's medication formulary list. *See* Br. at 12.[5] However, they ignore the restriction on the formulary that limits the use of Klonopin only to "7 days continuation and 21 day taper (total of 28 days) for patients arriving on benzodiazepines," regardless of the individual needs and risks presented by a patient. SOF, ¶ 33. As Dr. Bursztajn testified, a 21-day taper is far below an

---

[4] Gabor also testified to the existence of a sign in Dr. Kononov's office that stated "No benzodiazepines" and testified further that Dr. Kononov informed Gabor that Wexford did not dispense benzodiazepines at Stateville. SOF, ¶ 6. The Wexford Defendants ask this Court to disregard Gabor's testimony as not credible, *see* Br. at 13, but that is a credibility determination this Court cannot make at summary judgment. 578 F.3d at 529.

[5] Xanax is not on Wexford's formulary, consistent with Gabor's verified allegation that Wexford prohibited the administration of Xanax. SOF, ¶ 7.

14

accepted medical standard. *Id.*. In any event, the existence of a written policy cannot defeat a *Monell* claim where there is sufficient evidence the defendant's actual practice towards the treatment of its mentally ill inmates was so inadequate that it constituted a constitutional deprivation. *See Woodward*, 368 F.3d at 927-929 (affirming trial verdict in favor of *Monell* claim despite written policy requiring monitoring of suicide risk patients).

Finally, compounding this problem is that Wexford's Pharmacy Policies and Procedures during the relevant time period do not include any policy requiring the careful monitoring of patients suffering from benzodiazepine withdrawal. SOF, ¶ 26. Thus, Wexford installed a policy that discontinued Gabor's Xanax prescription that he had been taking for 7 years, without any explanation or consultation with Gabor's prescribing physician, imposed a dangerously accelerated taper from benzodiazepines without medical justification or any concern for Gabor's individual needs or medical risks, and then failed to adequately monitor and treat Gabor when he suffered the predictable and painful withdrawal symptoms that Wexford's own policy and practice ensured would occur. Given these facts, summary judgment is wholly inappropriate, and unwarranted under controlling Seventh Circuit precedent. *See King*, 680 F.3d at 1020-21; *Woodward*, 368 F.3d at 931.

## CONCLUSION

For the reasons stated herein, the Wexford Defendants' Motion for Summary Judgment should be denied.

Dated:  April 22, 2021

Respectfully submitted,
FOLEY & LARDNER, LLP
By:  /s/ Jonathan W. Garlough
One of the Attorneys for Plaintiff, *Joshua A. Gabor*

Jonathan W. Garlough
Andrew T. McClain
FOLEY & LARDNER LLP
321 North Clark Street, Suite 3000
Chicago, Illinois 60654-5313
(312) 832-4500
(312) 832-4700 (facsimile)
jgarlough@foley.com
amcclain@foley.com

4822-6247-8054.4

## **CERTIFICATE OF SERVICE**

      I, Jonathan W. Garlough, an attorney, certify I electronically filed the foregoing document with the clerk of court for the Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

                                                           /s/ *Jonathan W. Garlough*

4822-6247-8054.4