**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSHUA GABOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 15 C 8508** |
| **v.** | ) | |
| | ) | **Judge Jorge Alonso** |
| **VICTOR DOZIER, MICHAEL LEMKE,** | ) | |
| **ILLINOIS DEPARTMENT OF** | ) | |
| **CORRECTIONS, WEXFORD HEALTH** | ) | |
| **SOURCES INC., DR. VITALI KONONOV,** | ) | |
| **DR. JAGANNATH PATIL, and DR. DON** | ) | |
| **MATTINGLY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Joshua Gabor, asserts claims against two doctors and their employer for denying him access to necessary medical care during his incarceration in the Illinois Department of Corrections, in violation of his Eighth Amendment right to be free of cruel and unusual punishment. Defendants move for partial summary judgment under Federal Rule of Civil Procedure 56. For the following reasons, the motion is granted in part and denied in part.

**I.    Local Rule 56.1, Request to Strike, and Motions to Seal**

Local Rule 56.1(a) requires a party moving for summary judgment to submit a statement of material facts "consist[ing] of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials." The non-movant must submit a "concise response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits [and other] parts of the record." Local Rule 56.1(b)(3)(A)-(B). If the non-movant seeks to present his own facts, he must submit "a statement, consisting of short numbered paragraphs, of any additional

facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C), to which the moving party may likewise reply, Local Rule 56.1(a).

In their reply brief, defendants ask the Court to "strike and disregard" certain portions of plaintiff's Local Rule 56.1 statement and response that violate Local Rule 56.1 because they are argumentative, they smuggle in additional facts, or they are not concise. There may be some merit in these arguments with respect to certain paragraphs, but nevertheless the Court is not inclined to strike anything. Despite the shortcomings defendants identify, plaintiff's Local Rule 56.1 submissions substantially achieve the purpose of the rule, which is to "to isolate legitimately disputed facts and assist the court in its summary judgment determination," *Brown v. GES Exposition Servs., Inc.*, No. 03 C 3921, 2006 WL 861174, at *1 (N.D. Ill. Mar. 31, 2006), as district courts do "not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information," *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). Plaintiff helpfully identified disputed facts and pointed to evidence in the record. By wading into the details of whether each paragraph technically complied with the local rule, the Court would only "waste time by . . . engag[ing] in busywork and judicial editing," rather than "addressing the merits" of the case," *U.S. Bank Nat. Ass'n v. Alliant Energy Res., Inc.*, No. 09-CV-078, 2009 WL 1850813, at *3 (W.D. Wis. June 26, 2009). Furthermore, defendants themselves do not strictly comply with Local Rule 56.1, frequently smuggling argument into their Local Rule 56.1 response, so they cannot be heard to complain about minor technical violations plaintiff may have committed.

Additionally, the parties have filed motions to seal certain exhibits to their Local Rule 56.1 statements and responses. Because the statements and responses themselves reproduce the critical portions of these exhibits, the Court grants the motions. However, the parties are warned that they

2

will not be permitted to maintain relevant evidence under seal at trial unless they are prepared to explain how it falls into one of the protectable categories recognized by the Seventh Circuit:

> In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is entitled to be kept secret . . . .

*Baxter Int'l, Inc. v. Abbott Lab'ys*, 297 F.3d 544, 546 (7th Cir. 2002).

## II. Background

The following facts are taken from the parties' Local Rule 56.1 statements and responses. These facts are either undisputed or presented from the point of view of plaintiff, the non-moving party. Because defendants have moved for summary judgment, the Court must consider the evidence in the light most favorable to plaintiff and give him "the benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence," without "necessarily vouch[ing] for the objective accuracy of all statements here." *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 674 (7th Cir. 2014).

Plaintiff suffers from a number of mental health issues, including post-traumatic stress disorder, panic disorder, general anxiety with agoraphobia, and depression. He had been receiving treatment from a psychiatrist for these issues for years when, in 2013, he was arrested and detained on charges related to the cultivation of cannabis. Plaintiff was ultimately convicted of the charges and transferred to the custody of the Illinois Department of Corrections ("IDOC"). His claims in this case stem from the treatment he received for his mental health issues in IDOC, which, according to plaintiff, was negligent and violated his constitutional rights.

The course of treatment at the core of this case began in February 2007, when plaintiff was referred to a psychiatrist for panic attacks. The psychiatrist, Dr. Gil Abelita, prescribed him Xanax. Plaintiff began to take Xanax continually at what was at first an increasing dosage, but then leveled

3

off and became stable. Over the following years, Dr. Abelita attempted to treat plaintiff with a few other drugs, including anti-depressants, but plaintiff seemed unable to tolerate any of them, so he continued with Xanax alone. Plaintiff's mental health problems remained serious, but Dr. Abelita believed that his symptoms and enjoyment of life improved significantly while he was on Xanax.

On February 6, 2013, plaintiff was arrested and detained at the McClean County Jail. The psychiatrist there, Dr. Okuleye, discontinued plaintiff's Xanax and substituted Klonopin, which, like Xanax, is in the benzodiazepine family. Plaintiff complained about the change, reported symptoms including panic attacks, and requested the Xanax back, but Dr. Okuleye and the other health care staff refused, keeping plaintiff on Klonopin.

Following his conviction, plaintiff was transferred to the custody of IDOC on October 3, 2013. He was initially housed at the Northern Reception and Classification Center ("NRC") at Stateville Correctional Center, where most inmates are temporarily housed and assessed before they are assigned a permanent place of incarceration. Plaintiff met with Dr. Kononov for an intake medical screening, and he informed him that he was on Klonopin. Plaintiff recalled at his deposition that Dr. Kononov responded, "[W]e do not give out Klonopin or benzodiazepines here." (Def.'s LR 56.1 Stmt., Ex. 2, Pl.'s Dep. at 66:19-20, ECF No. 187-1.) In fact, Dr. Kononov pointed to a list taped to his desk that said, "No benzodiazepines," and listed Xanax, Klonopin, and Ativan. Instead of prescribing a benzodiazepine, Dr. Kononov ordered a tapering of plaintiff's Klonopin, which IDOC staff carried out over the next nineteen days, and prescribed him the medications Tegretol and Buspar. Plaintiff began to suffer what he believed were medical complications from the Klonopin taper, and he submitted sick-call slips to see Dr. Kononov, but he saw no one until his symptoms became so serious that his cell mate called a doctor to their cell.

On October 23, 2013, plaintiff was transferred to Vandalia Correctional Center, where he was processed by a nurse who told him that Klonopin is not available to inmates at Vandalia. Over the following days, plaintiff continued to suffer from additional medical complications stemming from his mental health issues, including what he believed were seizures. On October 28, 2013, plaintiff met with Dr. Caldwell, a general practitioner, and informed him of his medical condition and of the discontinuance of his longtime treatment with Xanax. Dr. Caldwell referred plaintiff to Dr. Patil, a psychiatrist.

On November 4, 2013, plaintiff met with Dr. Patil and advised him of the abrupt (and, from plaintiff's perspective, ineffective) Klonopin taper that Dr. Kononov had initiated. Because he believed his condition was deteriorating and he seemed to be suffering withdrawal symptoms, plaintiff asked to be put back on Klonopin. Dr. Patil informed plaintiff that it was against policy to prescribe Klonopin or like medication to inmates. He refused to administer any benzodiazepines to plaintiff, instead prescribing him Celexa and Doxepin.

Over the following weeks, plaintiff continued to struggle with his mental health and with physical symptoms of apparent benzodiazepine withdrawal. He was not able to see Dr. Patil again until January 9, 2014. Plaintiff informed Dr. Patil of his condition and that the Celexa and Doxepin appeared to be worsening it, rather than improving it. He asked to be put back on Xanax. Dr. Patil refused, instead suggesting increasing the dosage of Celexa or replacing it with Remoran or Clonidine. Frustrated, plaintiff stopped taking the Celexa, instead "cheeking" it, *i.e.*, pretending to take it but actually hiding it in his cheek to spit out later.

Throughout the rest of his term of incarceration, which ended on July 21, 2014, plaintiff continued to struggle with his mental and physical health. He made numerous requests of correctional and medical staff at IDOC to see someone about being put back on Xanax, even

submitting grievances, but all his requests were either ignored or denied. Plaintiff's mental health continues to be poor to this day, and he still experiences associated physical issues, including visual disturbances, burning sensations, pain, and feelings of frenzy.

Plaintiff has engaged Dr. Harold J. Bursztajn, an associate professor of psychiatry at Harvard Medical School, as an expert witness. Dr. Bursztajn opines that plaintiff's medical care in IDOC deviated from the standard of care because plaintiff's benzodiazepine taper was inappropriately short and IDOC did not appropriately monitor him for symptoms of withdrawal. Plaintiff has also deposed Dr. Pablo Stewart, who served as the court-appointed monitor of mental health treatment in IDOC facilities in *Rasho v. Baldwin, et al.*, Case No 07-cv-1298 (C.D. Ill.). Dr. Stewart testified that, during his investigation of the mental health care system in IDOC, he observed other instances in which inmates' stable mental health treatment with benzodiazepines was discontinued arbitrarily or without explanation.

Plaintiff originally filed this case in September 2015. He filed the operative Second Amended Complaint (ECF No. 67) on October 25, 2016, asserting claims against three defendants: Dr. Kononov, Dr. Patil, and Wexford Health Sources, Inc. ("Wexford"), their employer and IDOC's health services vendor. The complaint consists of five counts: Count I, against Wexford, under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for denying plaintiff access to adequate medical care, in violation of his Eighth Amendment right to be free from cruel and unusual punishment, pursuant to a policy and widespread practice of causing such constitutional deprivations; Counts II and III, against Dr. Kononov and Dr. Patil, respectively, under 42 U.S.C. § 1983, for deliberate indifference to plaintiff's serious medical needs in violation of his Eighth Amendment rights; Count IV, against Dr. Kononov and Dr. Patil, for medical malpractice under Illinois law; and Count V, against Wexford, for medical malpractice under a

*respondeat superior* theory for the negligent acts of Dr. Kononov and Dr. Patil. Defendants move for summary judgment on all claims except Count V as it pertains to Dr. Kononov's alleged negligence.

## III. Legal Standards

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

"Section 1983 creates a 'species of tort liability,'" *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 417 (1976)), against any person who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution," 42 U.S.C. § 1983. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." U.S. Const. Amend. VIII. When correctional officers or staff display "deliberate indifference to serious medical needs of prisoners," they violate the Eighth Amendment's prohibition of cruel and unusual punishments. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A

prisoner complaining of such deliberate indifference must show that the defendants knew that he had an objectively serious medical condition, they were deliberately indifferent to providing the treatment the prisoner needed, and their indifference caused the prisoner harm. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

"[A] prisoner's medical need is 'serious' where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). To show that he was treated with deliberate indifference, a prisoner need not "'show that he was literally ignored,'" *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Sherrod v. Lingle,* 223 F.3d 605, 611 (7th Cir. 2000)), but he must show more than mere negligence:

> The [accused] officials must know of and disregard an excessive risk to inmate health; indeed they must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must also draw the inference. This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk.

*Greeno*, 414 F.3d at 653 (internal citations and quotation marks omitted). Prison staff may exhibit deliberate indifference to a known condition through inaction, *Gayton*, 593 F.3d at 623-24; *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 832 (7th Cir. 2009), or by providing treatment that was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition. *Greeno*, 414 F.3d at 654 (citing *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir. 1996)).

Under § 1983 and *Monell*, 436 U.S. at 694, "[p]rivate corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices," *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012), where their

polices and practices "sanction[] the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citing *Estate of Novack ex rel. Turbin v. Cty. of Wood,* 226 F.3d 525, 530 (7th Cir. 2000)); *see Taylor v. Wexford Health Servs.*, Inc., No. 11 C 7386, 2012 WL 245165, at *4 (N.D. Ill. Jan. 26, 2012) (St. Eve, J.) ("Plaintiff's claim is evaluated under the standard of *Monell* [because] Wexford qualifies as a state actor for Section 1983 purposes[, since] it is performing a governmental function that was delegated to it by the IDOC, but it is not considered an arm of the State of Illinois for sovereign immunity and Section 1983 purposes because it is legally a separate entity from the State and would [be] required to pay any judgments on its own.") (internal citations omitted).

To prevail on his claim against Wexford, plaintiff must show that Wexford had a policy or practice of automatically taking inmates off benzodiazepines, that the practice amounts to a policy of deliberate indifference to inmates' objectively serious medical needs, and that plaintiff was harmed as a result. *See Monell*, 436 U.S. at 694; *Estelle*, 429 U.S. at 104-05; *Dean v. Wexford Health Sources, Inc.,* 18 F.4th 214, __, No. 20-3058, 2021 WL 5230855, at *13 (7th Cir. Nov. 10, 2021); *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016). Plaintiff must come forward with evidence that would allow a reasonable trier of fact to find not only that "systemic and gross deficiencies in . . . [IDOC'S] medical care system," caused his injury, but also that "a policymaker or official knew about these deficiencies and failed to correct them," *see Daniel*, 833 F.3d at 735, or that "'the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision,'" *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 790 (7th Cir. 2006) *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016))); *see also Daniel*, 833 F.3d at 734

(plaintiff can show sufficiently pervasive practice by showing "'a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event'") (quoting *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006)). Although plaintiff need not present evidence that such systemic failings actually caused pain and suffering to other specific inmates, he must show that the systemic failings, not wrongdoing merely unique to his own experience, were the "'moving force' behind his constitutional injury." *Dixon*, 819 F.3d at 348 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)); *see Daniel*, 819 F.3d at 734-35. "This 'rigorous causation standard' requires "a direct causal link between the challenged municipal action and the violation of [the plaintiff's] constitutional rights." *Dean*, 2021 WL 5230855, at *13 (quoting *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)).

To prevail on a claim of medical malpractice under Illinois law, plaintiff must prove the following elements: "'(1) the standard of care in the medical community by which the [medical provider's] treatment was measured; (2) that the [medical provider] deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care.'" *Vargas v. United States*, 430 F. Supp. 3d 500, 510 (N.D. Ill. 2019) (quoting *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000)). Expert testimony is generally necessary to establish all three elements, *Wilbourn v. Cavalenes*, 923 N.E.2d 937, 949 (Ill. App. Ct. 2010), by a preponderance of the evidence, *Holton v. Mem'l Hosp.*, 679 N.E.2d 1202, 1207 (Ill. 1997).

## IV.   Analysis

Defendants seek summary judgment on three issues. First, they seek summary judgment on the claims against Dr. Kononov individually because Dr. Kononov passed away in 2016, and although defendants filed a suggestion of death, plaintiff never sought to substitute another party for him. Second, they seek summary judgment on the claims against Dr. Patil—and the *respondeat superior* claim to the extent it is premised on actions of Dr. Patil—because, they argue, plaintiff

10

offers no expert testimony showing that Dr. Patil breached the standard of care, and Dr. Patil was not deliberately indifferent to plaintiff because he offered treatment that plaintiff refused to the extent he "cheeked" medication. Finally, defendants seek summary judgment on the *Monell* claim, arguing that plaintiff has not adduced sufficient evidence to prove that there was any policy or widespread practice prohibiting the prescription of benzodiazepines because he points to no admissible evidence other than his own mental health treatment.

Plaintiff does not contest the motion as to the claims against Dr. Kononov. Therefore, the Court grants summary judgment on Count II and Count IV as against Dr. Kononov. As for the other issues, plaintiff argues that (a) there is a genuine issue of material fact on the claims against Dr. Patil because he blatantly deviated from the standard of care, as evidenced by Dr. Bursztajn's testimony, and (b) there is substantial evidence of a widespread practice among Wexford employees of arbitrarily taking inmates off benzodiazepines at intake, as evidenced by certain testimony of Dr. Patil, Dr. Caldwell, Dr. Bursztajn, and Dr. Stewart.

## A. Dr. Patil

In opposing summary judgment on the claims concerning the care provided by Dr. Patil, plaintiff proffers Dr. Bursztajn's testimony that Dr. Patil blatantly departed from the standard of care. Defendants cry foul, arguing that it is unfair and improper for plaintiff to rely on Dr. Bursztajn's expert testimony to overcome summary judgment because plaintiff did not disclose that Dr. Bursztajn would proffer an opinion on Dr. Patil's care. Indeed, defendants argue, Dr. Bursztajn never mentioned Dr. Patil in his report, apart from a couple of passing references, and even those were only in the background sections of his report, never in the section containing his opinions.

11

When a party retains an expert to testify at trial, he must "disclose to the other parties the identity of" his expert witness, and "this disclosure must be accompanied by a written report." Fed. R. Civ. P. 26(a)(2)(A)-(B). "The report must contain," among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). "Rule 26(a) expert reports must be 'detailed and complete.'" *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998) (quoting Fed. R. Civ. P. 26 Advisory Committee's note). "A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor." *Salgado*, 150 F.3d at 742 n.6. The expert report is not complete if opposing counsel would be forced to depose the expert to "avoid ambush at trial," *id.*, or if the substance of the expert's opinions is not evident until he "supplement[s] them with later deposition testimony," *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008).

Still, "'[t]he purpose of these [expert] reports is not to replicate every word that the expert might say on the stand'"; it is merely to "'convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (quoting *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009)). The expert need not incant magic phrases relevant to particular issues in order to offer opinions on those issues, so long as the substance of the opinion is clear. For example, in *Kirkland v. Sigalove*, No. 11 C 7285, 2015 WL 523673, at *2 (N.D. Ill. Feb. 6, 2015), the defendant moved to bar the plaintiff's expert from testifying that defendant was negligent under a *res ipsa loquitur* theory, arguing that the expert had not disclosed an opinion supporting that theory. The court denied the motion, reasoning that although the expert had not used the phrase "*res ipsa loquitur*" in his report, he had clearly opined that the defendant

was in control of the device that had caused the plaintiff's injury and that the injury could not have happened but for negligence, so the opinion supported a *res ipsa loquitur* theory, regardless of whether the expert used the term. *Id.*

Similarly, although Dr. Bursztajn may not have used Dr. Patil's name in the opinion section of his report, he clearly opined that plaintiff received substandard mental health care from Wexford physicians throughout his term of incarceration, particularly with respect to the withholding of benzodiazepines. Since defendants knew that plaintiff was accusing Dr. Patil of providing substandard mental health care in just that way, the Court is not persuaded that defendants will have somehow been "ambushed" if Dr. Bursztajn testifies against Dr. Patil.

Dr. Bursztajn begins section IV of his expert report, the section captioned, "Forensic Neuropsychiatric Opinion," by stating that it is his "opinion" that "the psychiatric and medical treatment Joshua Gabor received in prison from October 2013 to July 2014 blatantly and inappropriately deviated from the standard of care" by means of the "abrupt discontinuation of benzodiazepines" and "without taking generally accepted precautions for monitoring . . . withdrawal." (Pl.'s LR 56.1 Stmt., Ex. 3, Bursztajn Report at 6, ECF No. 189-2.) "Specifically," Dr. Bursztajn continues, "Wexford Health Sources and its physicians," among other things:

> failed appropriately to take or obtain an adequate clinical history or to conduct an adequate review of records and collateral sources[;] . . . failed appropriately to provide a prescription for Mr. Gabor to continue his benzodiazepine regimen pending further evaluation; . . . failed appropriately to consider and address the risk of injury and suffering to Mr. Gabor due to discontinuing his benzodiazepine treatment; . . . failed appropriately to provide regular frequent medical supervision and monitoring . . . ; . . . failed to respond appropriately when they belatedly made themselves aware of Mr. Gabor's withdrawal symptoms and deteriorated medical condition, including failure to reconsider and revise his medication regimen as well as to initiate more frequent monitoring; . . . [and] failed appropriately to consider hospitalization when Mr. Gabor's withdrawal symptoms reached a level of severity that called for such consideration.

(*Id.* at 7-8.) Further, Dr. Bursztajn opines, this deficient medical care "resulted in significant ongoing pain, suffering, psychological trauma, and emotional injury" that plaintiff otherwise would not have suffered, with ongoing and lasting effects. (*Id.* at 1-2; *see id.* at 6-7, 11-12.)

In the complaint, Dr. Patil is accused of disregarding plaintiff's need for an evaluation upon entering Vandalia, refusing to continue plaintiff on Xanax or another benzodiazepine, disregarding the risk of harm to plaintiff from benzodiazepine withdrawal, and disregarding the denial of appropriate medication to plaintiff, among other things. Attached to the complaint was a report prepared by Dr. Bursztajn in accord with 735 ILCS 5/2-622,[1] certifying that Dr. Patil deviated from the standard of care in the following respects:

> Dr. Patil failed to provide a timely and adequate evaluation of Mr. Gabor after [his] arrival in custody at Vandalia Correctional Center on 10/22/13, failed to provide a prescription for a benzodiazepine for Mr. Gabor, failed to examine, diagnose and treat Mr. Gabor in a timely manner despite Mr. Gabor's requests, failed to adequately treat Mr. Gabor's panic disorder and posttraumatic symptomology throughout his stay at Vandalia Correctional Center from 10/22/13 until his release, failed to do an adequate review of records and collateral sources, failed to take or obtain an adequate clinical history, and failed to appropriately consider or address the risk of injury and suffering to Mr. Gabor due to continuing benzodiazepine withdrawal, and failed to adequately monitor the continuing effects of the discontinuation of benzodiazepines.

(2d Am. Compl. Ex. B, ECF No. 67-2 at 5.)

The Court fails to see how defendants could have read Dr. Bursztajn's opinions about the mental health care provided by "Wexford Health Sources and its physicians" and failed to connect them to these allegations against Dr. Patil in the complaint. In some cases, Dr. Bursztajn even uses

---

[1] Under the Illinois Healing Malpractice Act, 735 ILSC 5/2-622, every malpractice plaintiff must file with his complaint an affidavit declaring "that the affiant has consulted with a qualified health professional who determined that the plaintiff has a reasonable and meritorious claim and who has drafted a written report that is attached to the affidavit," or give one of the two reasons enumerated by the statute (neither of which is applicable here) as to why he could not. *Kessler v. Pass*, No. 18 C 530, 2018 WL 5995537, at *1 (S.D. Ill. Nov. 15, 2018) (citing 735 ILCS 5/2-622).

some of the same phraseology that plaintiff used in the Second Amended Complaint and that Dr. Bursztajn used in his 2-622 certification in reference to the claims against Dr. Patil. *See Kirkland*, 2015 WL 523673, at \*2-3. While it is true that Dr. Bursztajn did not mention Dr. Patil's name in section IV of his report, whereas he did mention Dr. Kononov's name, it does not follow that Dr. Patil's opinions only pertain to plaintiff's initial care at Stateville. Dr. Bursztajn explicitly stated that his opinions pertain to the treatment plaintiff received "from October 2013 to July 2014" (Bursztajn Report at 5), and his opinions correspond to allegations against Dr. Patil in a way that any careful reading of his report in light of the complaint and accompanying § 2-622 certification could not fail to reveal.

Once Dr. Bursztajn's report and testimony are brought to bear, defendants' arguments for summary judgment in favor of Dr. Patil fall apart. Defendants argue that Dr. Patil examined and treated plaintiff and that plaintiff cannot establish that the treatment he provided was below the standard of care—much less so far below the standard of care as to meet the deliberate indifference standard. Nor, defendants argue, can plaintiff establish that any deficiencies in plaintiff's psychiatric treatment, as opposed to the underlying condition itself, caused plaintiff's injuries. But, based on Dr. Bursztajn's testimony, a reasonable jury could draw exactly those conclusions. Specifically, a reasonable juror could conclude that, even though Dr. Patil did not ignore plaintiff, the treatment he provided was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition, *Greeno*, 414 F.3d at 654, and that this inappropriate treatment caused harm that plaintiff would not otherwise have suffered. Further, it may be true that Dr. Patil offered certain treatment that plaintiff refused by "cheeking" it, but if the treatment was blatantly inappropriate to begin with, then plaintiff's refusal to take it hardly undermines his claims.

Dr. Bursztajn's expert report made a sufficiently detailed and complete disclosure of the substance of his opinions about the medical care that plaintiff received in IDOC, including the care provided by Dr. Patil, so the Court is unpersuaded to exclude Dr. Bursztajn's testimony as to Dr. Patil. That testimony provides sufficient evidence of inappropriate medical care to permit a jury to return a verdict against Dr. Patil on the claims of deliberate indifference and medical malpractice, and against Wexford on the *respondeat superior* claim to the extent it is premised on Dr. Patil's alleged malpractice. Because there is a genuine issue of material fact for trial on those claims, defendants' motion for summary judgment is denied as to Counts III, Count IV as to Dr. Patil, and Count V.

## B. *Monell* claim

In opposing summary judgment on the *Monell* claim, plaintiff argues that the testimony of Dr. Patil, Dr. Caldwell, Dr. Bursztajn, and Dr. Stewart amounts to sufficient evidence to create a triable issue of fact.

"A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Plaintiff does not appear to argue that there was an official policy against benzodiazepines adopted and promulgated by Wexford officers or that an official with final policy-making authority caused the deficient medical treatment he received. Instead, his theory appears to be that, by custom and practice, Wexford employees arbitrarily denied inmates benzodiazepines without due regard for the serious withdrawal symptoms that the inmates might suffer. To succeed under that theory, he must "demonstrat[e] that

16

there is a policy at issue rather than a random event or even a short series of random events" by "'introduc[ing] evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.'" *Bridges v. Dart*, 950 F.3d 476, 479 (7th Cir. 2020) (quoting *Phelan*, 463 F.3d at 790); *see Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) ("Although [the Seventh Circuit] has not adopted any 'bright-line rules' defining a widespread practice or custom, we have acknowledged that the frequency of conduct necessary to impose *Monell* liability must be more than three.") (quoting *Thomas*, 604 F.3d at 303).

The Court is not convinced that the testimony plaintiff adduces from Dr. Patil, Dr. Caldwell, or Dr. Bursztajn provides sufficiently substantial evidence to establish a practice so widespread that it amounts to a policy. First, plaintiff reads too much into both Dr. Patil and Dr. Caldwell's testimony. Plaintiff cites Dr. Patil's testimony that it "happens all the time in psychiatric treatment" that patients are "on benzodiazepines" and then they are "take[n] . . . off." (Defs.' LR 56.1 Resp. ¶ 23, ECF No. 197.) But in context, he was testifying about psychiatric treatment generally, drawing on his experience dating back to his residency; he was not addressing what typically happens in IDOC. Plaintiff cites Dr. Caldwell's testimony that, by the time inmates arrive at Vandalia, they have generally been at the NRC at Stateville for at least thirty days, which is long enough, in Dr. Caldwell's view, that they have been "thoroughly detoxed." (*Id.* ¶ 21.) While this testimony is inconsistent with Dr. Bursztajn's testimony about the length of time necessary to safely wean inmates off benzodiazepines and with plaintiff's testimony about how long he remained in the NRC, ultimately it amounts to little more than that Dr. Caldwell does not recall seeing inmates arrive from the NRC in what appeared to be benzodiazepine withdrawal. That provides little, if any, affirmative support for plaintiff's claim—indeed, it may undermine it.

17

As for Dr. Bursztajn, he observed that plaintiff was treated as if Wexford were operating under a blanket policy or practice, but this is of little help to plaintiff because he cannot establish a widespread practice by relying on his own case. Instead, he has to establish that Wexford's practice caused other inmates to suffer constitutional violations. *See Dean*, 2021 WL 5230855, at *15.

That leaves Dr. Stewart's testimony. Plaintiff deposed Dr. Stewart about his experience investigating the provision of mental health care in IDOC as a court-appointed monitor. Dr. Stewart testified that, during his first year of monitoring, he and his colleagues "personally encountered," among other things, "examples, usually of people that were being sent into IDOC who had been well maintained on benzodiazepines at their county jails where they were being held prior to being sent to prison and that the department, meaning IDOC, would stop them without explanation." (Defs.' LR 56.1 Resp. ¶ 39, ECF No. 197.)

Defendants cry foul here, arguing that plaintiff never disclosed Dr. Stewart as an expert, so plaintiff cannot rely on his expert testimony. Defendants are correct, and the Court agrees that plaintiff cannot call Dr. Stewart as an expert witness or rely on any opinion testimony he might offer, having never disclosed him as an expert. But, although some of the testimony that plaintiff proffers from Dr. Stewart is indeed opinion testimony, some of it, including the above-quoted testimony, is *fact* testimony. Testimony about what Dr. Stewart learned and observed while working in IDOC is fair game, to the extent that Dr. Stewart offers not conclusions or opinions but facts about what he "personally encountered" during his monitoring to suggest that IDOC arbitrarily took other inmates, like plaintiff, off benzodiazepines upon intake.[2]

---

[2] The Court recognizes that much of the relevant knowledge that Dr. Stewart gained from his monitoring is built not on "personally encountering" prescribing decisions in the sense that he personally watched Wexford physicians render them, but instead on what he learned from reviewing medical records and speaking to inmates and others within IDOC institutions. (*See,*

Defendants also argue that Dr. Stewart's observations are too stale to support plaintiff's *Monell* claim because he did not begin his monitoring until June 2016, approximately two years after plaintiff was released from IDOC and even longer after he first saw Dr. Patil in November 2013. To prove a *Monell* claim, "post-event evidence is admissible if it 'sufficiently relates to the central occurrence.'" *Est. of Keys v. City of Harvey*, No. 92 C 2177, 1996 WL 34422, at *4 (N.D. Ill. Jan. 26, 1996) (quoting *Foley v. City of Lowell, Mass.*, 948 F.2d 10, 14 (1st Cir. 1991) and citing *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir. 1987), *vacated on other grounds,* 835 F.2d 1222 (7th Cir. 1988)). Such evidence may be admitted to demonstrate that "'there may be a continuity in municipal policy so that what happens after the event may cas[t] some light on what the policy was prior to the event." *Keys*, 1996 WL 34422, at *4 (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 n.11 (1st Cir. 1989)); *see Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1070 n.23 (N.D. Ill. 2018).[3]

_____

*e.g.*, Pl.'s LR 56.1 Stmt., Ex. 4, Stewart Dep. at 68:14-69:13, ECF No. 195-2.) Although this might seem to present a hearsay problem, the information Dr. Stewart relied on presumably meets a hearsay exception under Federal Rule of Evidence 803(4) and, to the extent that he relied on records, 803(6). Importantly, at the summary judgment stage, evidence need only be admissible in substance rather than form. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). Because there is a potential basis for admission of this evidence at trial, the Court will not ignore Dr. Stewart's testimony to the extent that it is based on what he was told by inmates or found in their medical records. In any case, no one makes the argument to exclude his testimony on that basis.

[3] The Court notes that the Seventh Circuit has stated in *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994), that "subsequent conduct usually cannot be used to establish municipal liability," but the Court does not interpret *Calusinski* to bar Dr. Stewart's testimony here. In *Calusinski*, the plaintiff proffered evidence of an excessive force "incident that occurred years after" the incident of excessive force that he suffered, and the Seventh Circuit stated that "subsequent conduct [was] irrelevant to determining" whether the municipality "knew or should have known about the alleged unconstitutional conduct on the day of the [plaintiff's] incident," and therefore could not support a finding of municipal liability. *Id.* Under *Calusinski*, a single incident of unconstitutional misconduct similar but subsequent to that suffered by the plaintiff cannot prove that a municipality had notice of a widespread practice at the time of the earlier incident, *see Dean*, 2021 WL 5230855, at *14-15, but it does not follow that "similar subsequent incidents" are never "probative and material of what policies, practices, or . . . customs existed at the time" of a *Monell* plaintiff's deprivation of constitutional rights. *Whitt v. City of St. Louis*, No. 4:18-CV-1294, 2020 WL 7122615, at *7 (E.D. Mo. Dec. 4, 2020). To the contrary, such evidence is relevant "to the

At his deposition, Dr. Stewart testified in broad terms about encountering what appeared to be numerous examples of inmates who were taken off benzodiazepines without explanation. If what Dr. Stewart found when he began his monitoring in June 2016 suggests that the practice was truly widespread, it is at least possible that the evidence would warrant a reasonable juror in concluding that the practice dated back to 2013 or 2014. *See W.R. Grace & Co.--Conn. v. Zotos Int'l, Inc.*, No. 98-CV-838S, 2004 WL 5669337, at *2 (W.D.N.Y. May 14, 2004) ("To state the matter simply—evidence that Defendant had a routine business practice or policy during the early 1960s tends to show that Defendant might have had the same policy . . . in place during the 1950s."). This evidence "sufficiently relates to the central occurrence" because it has the potential to convince a reasonable juror that there was a widespread practice among Wexford-employed doctors to automatically refuse benzodiazepines to inmates who may have required them to maintain the stability of their mental health and avoid dangerous withdrawal symptoms. *See King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (plaintiff's *Monell* claim survived summary judgment based on evidence of a policy or practice of arbitrarily refusing prescribed medication without appropriate alternatives).

True, Dr. Stewart did not say precisely how many incidents like plaintiff's he was aware of, nor did he say when they occurred, nor how many different prescribers he found to have refused benzodiazepines to inmates. The thinness of his testimony puts plaintiff in a dangerous position, as summary judgment is the "put up or shut up" moment in a lawsuit. *See, e.g.*, *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021). Plaintiff comes close to having failed to "put up" enough evidence to support his *Monell* claim. But, given that Dr. Stewart implied

---

existence of a custom." *Id.* (citing *Foley*, *Sherrod*, and like cases); *see also Abdur-Rahim v. City of Columbus*, No. 2:17-CV-601, 2019 WL 1873222, at *2 (S.D. Ohio Apr. 26, 2019) (same, citing cases). And if the custom or practice is sufficiently pervasive, the Court may infer that municipal policymakers had notice of it. *Dixon*, 819 F.3d at 348.

that he was aware of many examples of inmates who were situated similarly to plaintiff with respect to the refusal of benzodiazepines, the evidence that plaintiff has marshalled amounts to more than mere "speculati[on] about testimony that may come out at trial." *Cf. Taylor v. Kilmer*, No. 18 C 7403, 2021 WL 76828, at *5 (N.D. Ill. Jan. 8, 2021); *Leite v. Goulet*, No. 15-CV-280-PB, 2018 WL 3057740, at *10 (D.N.H. June 20, 2018) (internal quotation marks omitted); *Hartstein v. Pollman*, No. 13-CV-1232-JPG-PMF, 2016 WL 2996851, at *4 (S.D. Ill. May 25, 2016). The Court must accept plaintiff's version of the facts and draw all reasonable inferences in his favor at this stage, and that means that, although Dr. Stewart's testimony requires "elaboration" to be "comprehensible" with respect to its bearing on plaintiff's claims, it narrowly prevents summary judgment here. *See Paape v. Wall Data, Inc.*, 934 F. Supp. 969, 980 (N.D. Ill. 1996) (Shadur, J.); *see also Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 38 (D.C. Cir. 1987) (on remand from United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986), denying summary judgment based on affidavit from witness who plaintiff intended to call at trial, even though the affidavit did not show definitively whether the witness had personal knowledge of relevant facts). The Supreme Court has admonished trial courts that they should not "act other than with caution in granting summary judgment," and they may "deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255; *see also Celotex*, 477 U.S. at 330 (Brennan, J., dissenting) ("[A]n ultimate burden of persuasion . . . always remains on the moving party."); 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2728 (4th ed.). In this borderline case, a trial on the *Monell* claim is the "better course"—although plaintiff is "forewarned . . . that [while his] claim cannot be dispatched on the present paper record, the

manner in which the evidence plays out at trial may perhaps trigger the operation of Rule 50(a)."
*See Paape*, 934 F. Supp. at 980.

## <u>CONCLUSION</u>

For the reasons set forth above, defendants' motion for summary judgment [186] is granted in part and denied in part. It is granted as to the claims in Counts II and IV against Dr. Kononov, but it is otherwise denied. The parties' motions to seal [196, 190, 193] are granted. A status hearing is set for January 14, 2022. The parties are directed to confer regarding settlement.

**SO ORDERED.**

ENTERED:  December 13, 2021

**HON. JORGE L. ALONSO**
**United States District Judge**